# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **UNGARETTI & HARRIS LLP,** | ) | |
| | ) | |
| **Appellant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07 C 1292 and** |
| | ) | **Case No. 07 C 1293** |
| | ) | **(consolidated)** |
| | ) | |
| | ) | |
| **JAY A. STEINBERG, not individually but** | ) | |
| **solely as Chapter 7 Trustee for RESOURCE** | ) | |
| **TECHNOLOGY CORPORATION,** | ) | |
| | ) | |
| **Appellee.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This bankruptcy appeal arises from an adversary proceeding that is part of the bankruptcy of Resource Technology Corporation ("RTC"). Plaintiff-appellant Ungaretti & Harris, LLP ("Ungaretti") served as counsel to the Chapter 11 trustee of RTC's estate before the case was converted to a Chapter 7 liquidation. In late 2006, defendant-appellee Jay Steinberg, RTC's Chapter 7 trustee, sought the bankruptcy court's approval for a settlement that he had reached with Ungaretti concerning its claims to certain funds in the possession of the Chapter 7 estate. The bankruptcy court denied approval and gave the parties a week to file motions for summary judgment. Steinberg's ensuing motion for judgment on the pleadings was granted in January 2007. Ungaretti now appeals from the bankruptcy court's denial of approval for the Steinberg-Ungaretti settlement and its grant of judgment on the pleadings for the Chapter 7 estate, as well as its denial of Ungaretti's request for a preliminary injunction barring disbursement of certain

1

funds held by Steinberg. For the reasons set forth below, the Court affirms the bankruptcy court's rulings.

## I. Background

### A.     The RTC bankruptcy case and Ungaretti's adversary proceeding

The background of the RTC bankruptcy case, ably described by the bankruptcy court in its December 4, 2006 opinion, *Ungaretti & Harris LLP v. Steinberg* (*In re Resource Tech. Corp.*), 356 B.R. 435, 438-43 (Bankr. N.D. Ill. 2006), is summarized below.

RTC's business involved removing methane gas from landfills and, where possible, selling the gas or converting it to usable energy. In November 1999, RTC was made the subject of an involuntary bankruptcy proceeding. It consented to entry of an order for relief in January 2000.

RTC's principal secured creditors, at all relevant times, have been a group including Leon Greenblatt, Banco Panamericano, Chiplease, Inc., and other related entities (collectively, "the Lenders"). The Lenders, who include controlling persons of RTC, provided RTC's debtor-in-possession financing, secured by a lien on nearly all of its assets.

RTC operated as a debtor in possession until August 2003. At that point, problems with its management, including unauthorized payments to professionals and failures to file timely operating reports, led to the appointment of Gregg Szilagyi, an attorney then employed by Ungaretti, as the Chapter 11 trustee. Szilagyi administered the RTC estate for about two years, with Ungaretti as his counsel.

In June 2005, Szilagyi and the Lenders reached an agreement ("the Szilagyi-Lender settlement"), one byproduct of which is at the core of the adversary proceeding and this appeal.

This settlement provided that Szilagyi would pursue a motion to dismiss the RTC bankruptcy case, suspend any action affecting the Lenders' collateral pending a ruling on the motion to dismiss, seek dismissal of an injunctive proceeding Szilagyi had brought against the Lenders' lien enforcement activities, and file a timely notice of appeal with respect to an order entered against RTC in another adversary proceeding. In return, the Lenders agreed to pay $2 million in satisfaction of claims that Ungaretti asserted under section 506(c) of the Bankruptcy Code as compensation for preserving the Lenders' collateral. The Lenders transferred $1.5 million of this amount ("the Lender Funds") to Ungaretti when the Szilagyi-Lender settlement was executed, even though the settlement was not to become effective until the bankruptcy court approved it.

Two days after the Szilagyi-Lender settlement's execution, Szilagyi filed a motion seeking approval of the settlement and dismissal of the bankruptcy case. The motion generated objections from creditors other than the Lenders, and a hearing on the motion was held on September 19-20, 2005. During the hearing, the bankruptcy court expressed the view that any recovery on the section 506(c) claim asserted by Szilagyi and Ungaretti would belong to the RTC estate, so that the provision of the settlement calling for payment directly to Ungaretti could not be approved. In response, Szilagyi withdrew his request for approval of the settlement.

Also at the hearing, the bankruptcy court found problems that required further bankruptcy administration, notably Ungaretti's receipt of roughly $376,000 from the RTC estate without court authorization. (The bankruptcy court had made Ungaretti's compensation for its work as Szilagyi's counsel "subject to the court's subsequent approval as part of the normal interim fee application process approximately every 120 days"—approval Ungaretti did not seek

3

until twenty-two months after it began collecting payments for its work.  *In re Resource Tech. Corp.*, 356 B.R. at 444 n.1.)  On September 21, 2005, the court entered an order denying Szilagyi's motion for approval of the Szilagyi-Lender settlement "to the extent not withdrawn" and entered another order converting the case to Chapter 7.  Steinberg was appointed Chapter 7 trustee.  Thereafter, Ungaretti voluntarily transferred the Lender Funds to Steinberg's counsel, to be held in escrow.  Ungaretti, the Lenders, and the Chapter 7 estate all continued to assert claims on the Lender Funds.

In December 2005, Steinberg sought to terminate the Lenders' claim to the Lender Funds through a new motion to approve the Szilagyi-Lender settlement.  Steinberg argued that Szilagyi had done all that was required of him under the settlement agreement and that the agreement would be enforceable upon the court's approval.  Steinberg contended, however, that he, as Szilagyi's successor, should obtain the benefits of the settlement for RTC's Chapter 7 estate.  The bankruptcy court granted the motion, but the Lenders responded by seeking to vacate approval of the settlement.

In February 2006, Steinberg sought the bankruptcy court's approval for a new settlement with the Lenders ("the Steinberg-Lender settlement") designed, among other things, to settle the question of the Lender Funds by placing them with the Chapter 7 estate, with the Lenders waiving any claims to the funds.   In March 2006, the bankruptcy court approved the Steinberg-Lender settlement; the Lenders' motion to vacate the court's approval of the Szilagyi-Lender settlement was withdrawn as moot.  The Steinberg-Lender settlement thus effectively superseded the earlier Szilagyi-Lender settlement.  Pursuant to the Steinberg-Lender settlement, the bankruptcy court entered an order authorizing Steinberg's counsel "to distribute $1.5 million of

the funds held in escrow relating to the Settlement Agreement to Steinberg for the benefit of the Estate" on March 28, 2006.

In response to these developments, Ungaretti in April 2006 filed the adversary proceeding from which this appeal arises. Ungaretti sought injunctive relief and turnover of the Lender Funds, asserting three grounds for claiming the funds. First, Ungaretti contended that because its services provided the basis for the section 506(c) claim created by the Szilagyi-Lender settlement, it was entitled to the Lender Funds as a section 506(c) recovery. Second, Ungaretti contended it was entitled to the imposition of a constructive trust on the Lender Funds for unpaid trustee fees and attorneys' fees. Third, Ungaretti asserted it had a claim in *quantum meruit* for its services that entitled it to the Lender Funds. Along with its adversary complaint, Ungaretti filed a motion for preliminary injunction to prevent Steinberg from expending the Lender Funds.

Before the bankruptcy court could enter a ruling on the motion for preliminary injunction or the pending fee applications of Szilagyi and Ungaretti, Steinberg proposed yet another settlement (the "Steinberg-Ungaretti settlement"). Under the agreement, Ungaretti and Szilagyi would waive their claims to the Lender Funds. In exchange, the Chapter 7 RTC estate was to pay roughly $250,000 to Ungaretti for its work as Szilagyi's counsel and for "transition services" that benefitted Steinberg's Chapter 7 administration. Ungaretti was also to receive an allowed Chapter 11 administrative claim of roughly $1.8 million and a waiver of the estate's claim for disgorgement of the unauthorized payments Ungaretti had received from the RTC Chapter 11 estate. Szilagyi was to receive an allowed Chapter 11 administrative claim in the amount of $250,000. The Lenders opposed Steinberg's motion to approve the settlement.

**B.      The bankruptcy court's December 4, 2006 order**

In an order dated December 4, 2006, the bankruptcy court denied approval for the Steinberg-Ungaretti settlement.  The bankruptcy court reasoned that the consideration Ungaretti would receive under the settlement was not in the best interests of the Chapter 7 RTC estate under section 363 of the Bankruptcy Code and *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994).  Specifically, the bankruptcy court concluded the net cash payment to Ungaretti was outside the range of reasonable litigation outcomes because Ungaretti had no serious chance of prevailing on its claim to the Lender Funds.  In contrast, the estate was "very likely [to] succeed" in its claim for disgorgement of the unauthorized payments because the estate lacked the resources to pay its Chapter 7 administrative expenses, which section 726(b) of the Bankruptcy Code places ahead of Chapter 11 administrative claims in cases such as this one.  *In re Resource Tech. Corp.*, 356 B.R. at 443.

None of Ungaretti's three bases for asserting a claim to the Lender Funds "ha[d] any likelihood of success," the bankruptcy court concluded.  *Id.* at 444.  Ungaretti's argument that the funds were a section 506(c) surcharge against the Lenders' collateral failed because Ungaretti was not awarded the funds pursuant to a bankruptcy trustee's request, as required by *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 9 (2000)—and in any event, a section 506(c) surcharge recovery cannot properly be paid to an individual administrative creditor, but can only be recovered for the estate's benefit.  *In re Resource Tech. Corp.*, 356 B.R. at 444-45.

Ungaretti's argument for a constructive trust failed, the bankruptcy court held, because the wrongful conduct typically required under Illinois law for the imposition of a constructive trust was absent.  Ungaretti's argument that the Lender Funds were a "windfall" for the Chapter

7 estate because it was Ungaretti's efforts that led the Lenders to pay out the $1.5 million was at odds with the "bankruptcy policy [of] providing the funds necessary to administer a Chapter 7 liquidation." *Id.* at 447-48. Ungaretti's claim for fees for its services, the bankruptcy court held, "like the claims of other Chapter 11 administrative claimants in this case, may not be paid in full, but that is the proper result of the priorities established by the Bankruptcy Code, not a wrongful result of conduct by the Chapter 7 trustee." *Id.* at 448.

Finally, the bankruptcy court rejected Ungaretti's *quantum meruit* claim, holding that this quasi-contractual remedy cannot create a right to a particular fund, but operates only to prevent unjust enrichment. *Id.* at 448-49. In any event, Ungaretti had no need of such an equitable remedy to establish its right to be paid for its work for the Chapter 11 estate because of its express contract with Szilagyi. *Id.* at 449. The bankruptcy court rejected Ungaretti's attempt to "employ quantum meruit to evade the priorities established by the Code." *Id.*

The bankruptcy court also characterized the Chapter 7 estate's proposed payment to Ungaretti for "transition services" as baseless—Steinberg had never employed Ungaretti under section 327 of the Bankruptcy Code—and therefore as another reason to hold the settlement to be outside the range of reasonable litigation outcomes. *Id.* at 449. The bankruptcy court also rejected the settlement provisions awarding Szilagyi and Ungaretti administrative claims in fixed amounts "insofar as it propose[d] to eliminate independent judicial review" of their claims. *Id.* at 449-50.

On December 5, 2006, the bankruptcy court entered an order giving the parties to the adversary proceeding leave to file motions for summary judgment. Both Ungaretti and Steinberg acknowledge that Steinberg's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), filed one week later, relied on the bankruptcy court's reasoning in

its December 4, 2006 ruling. Ungaretti Br. at 11; Steinberg Br. at 6. The bankruptcy court did not issue a detailed decision in support of its January 18, 2007 order granting Steinberg's motion; rather, its one-page minute order referred to the reasoning given in its December 4, 2006 order.[1] Thus, the Court will look to the reasoning of the December 4, 2006 order in reviewing all three of the bankruptcy court's decisions challenged on appeal—the denial of approval for the Steinberg-Ungaretti settlement, the denial of Ungaretti's motion for a preliminary injunction, and entry of judgment on the pleadings for Steinberg.

## II. Discussion

### A. Jurisdiction and standards of review

The Court has jurisdiction pursuant to 28 U.S.C. § 158(a). In general, under Federal Rule of Bankruptcy Procedure 8013, the Court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law, including its interpretation of the Bankruptcy Code, *de novo*. *In re Heartland Steel*, 389 F.3d 741, 743-44 (7th Cir. 2004).

In this context, the Court acts as an appellate court and applies the same standards of review as are appropriate in other appellate decisions. *Green v. Mass. Cas. Ins. Co.*, 269 B.R. 782, 787 (N.D. Ill. 2001). Accordingly, the Court reviews *de novo* an order granting a motion for judgment on the pleadings under Rule 12(c), accepting all well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 n.6 (7th Cir. 2000). "If a defendant raises a Rule 12(b) defense in a Rule 12(c) motion, a Rule 12(b)(6)-type analysis applies." *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 619 (7th Cir. 2007) (*citing Alexander v. City of Chicago*, 994

---

[1] The January 18, 2007 minute order also refers to reasons given in open court. Neither party, however, has made a transcript of those proceedings a part of the record on appeal.

F.2d 333, 336 (7th Cir. 1993)). Under this analysis, the plaintiff's allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (*citing Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 127 S.Ct. at 1964-65.

The denial of a preliminary injunction is reviewed for abuse of discretion. *Vencor, Inc. v. Webb*, 33 F.3d 840, 844 (7th Cir. 1994) (*citing Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)). Approval or denial of a settlement is likewise reviewed for abuse of discretion. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007) (*citing Depoister v. M. Holloway Fdn.*, 36 F.3d 582, 586 (7th Cir. 1994)).

## B.     Grant of judgment on the pleadings for Steinberg

Ungaretti appeals from the bankruptcy court's grant of Steinberg's motion for judgment on the pleadings, but it does not directly address this ruling in its appellate briefs. Rather, it focuses on the bankruptcy court's denial of the preliminary injunction for which Ungaretti moved the bankruptcy court on the same day that it filed its complaint. The Court assumes that Ungaretti's failure to address directly the bankruptcy court's grant of judgment on the pleadings for Steinberg stems from the overlap in the relief Ungaretti sought in its complaint and in its motion for a preliminary injunction.

Because the Court is reviewing a grant of judgment under Rule 12(c), it must assess the pleadings in their own right under the appropriate, *de novo* standard of review. *See Forseth*, 199

F.3d at 368.  Ungaretti advances three theories under which it asserts it is entitled to the Lender Funds in its complaint.

### 1.     Section 506(c) surcharge theory

In Count 1 of its complaint, Ungaretti sought an order enjoining Steinberg from making any disbursements from the Lender Funds, allowing Ungaretti a section 506(c) surcharge, and requiring turnover to Ungaretti of the "reasonable and necessary" costs stemming from its work for the RTC Chapter 11 estate.  Ungaretti Compl. ¶¶ 22-27.

The threshold question for the Court concerns the applicability of section 506(c), and specifically whether the Lender Funds constitute a surcharge under that section.  Section 506(c) provides that

> [t]he trustee may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c).  The recovery of these "reasonable, necessary costs and expenses" out of the secured property is called a surcharge.

As the Supreme Court has explained, section 506(c) "constitutes an important exception to the rule that secured claims are superior to administrative claims."  *Hartford Underwriters*, 530 U.S. at 5.  The trustee or debtor-in-possession may use this provision of the code to recover administrative costs from estate property encumbered by the security interests of secured creditors such as the Lenders in this case.  The Supreme Court in *Hartford Underwriters* clarified that *only* the trustee or debtor-in-possession may invoke section 506(c); the statute "does not provide an administrative claimant an independent right to seek payment of its claim" from secured creditors' collateral.  *Id.* at 14.

Thus, the trustee's role is critical under section 506(c). So, too, is that of the bankruptcy court, which must approve section 506(c) surcharges. To gain this approval, the trustee or debtor-in-possession must show that the costs and expenses sought to be surcharged were reasonable and necessary to preserve or dispose of the collateral and that their incurrence provided some benefit to the secured creditor, or that the secured creditor caused or consented to that incurrence. 11 U.S.C. § 506(c); *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260-61 (9th Cir. 2000) (*citing In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987)).

Did either RTC bankruptcy trustee seek and obtain bankruptcy court approval for a section 506(c) surcharge in connection with the Lender Funds? Ungaretti argues that the Lender Funds were paid "through § 506(c) on the request of a Trustee" because Steinberg's December 2005 motion for approval of the Szilagyi-Lender settlement characterized the Lender Funds as a surcharge pursuant to section 506(c), as did the bankruptcy court's initial approval of the settlement. Ungaretti Br. at 14. Ungaretti also argues that the Lender Funds arise under section 506(c) because the Lenders actually paid the $1.5 million pursuant to an settlement agreement negotiated by Szilagyi, who was then trustee of the Chapter 11 RTC estate. Ungaretti Reply Br. at 5.

Steinberg argues that the Lender Funds are not a section 506(c) surcharge because the bankruptcy court never issued an order approving a surcharge against the Lenders' collateral, and therefore "these proceedings have nothing to do with § 506(c)." Steinberg Br. at 8. The bankruptcy court took the same view, holding that Ungaretti "was not given an allowance under § 506(c) on motion of a trustee" with attendant approval by the court. *In re Resource Tech. Corp.*, 356 B.R. at 438. The bankruptcy court noted that Szilagyi had abandoned his motion for

approval of the Szilagyi-Lender settlement in 2005 and that the court had ultimately approved payment of the Lender Funds under the Steinberg-Lender settlement "with no specific amount allocated to a § 506(c) surcharge." *Id.* at 444.

Ungaretti's arguments for why the Lender Funds constitute a section 506(c) surcharge do not raise a plausible prospect of its entitlement to the relief it sought. It is true, as Ungaretti notes, that the language of the Szilagyi-Lender agreement referred to a "506(c) settlement" and that Steinberg and the bankruptcy court appear to have used that term. But that is not dispositive of the legal question now before the Court; the question is what actually happened, not the phraseology that was used. Second, whatever the understanding between the trustee and other parties to a settlement might have been, the trustee must seek and obtain bankruptcy court approval for a section 506(c) surcharge. For this reason, Ungaretti's argument that "[t]he Lenders paid this money pursuant to the § 506(c) settlement . . . [whose] terms were negotiated by the Chapter 11 Trustee" is unavailing. As the bankruptcy court noted, the transfer of the Lender Funds at the time the Szilagyi-Lender settlement was executed was premature because "the settlement would not become effective unless approved by the court." *In re Resource Tech. Corp.*, 356 B.R. at 440. When the bankruptcy court ultimately approved the transfer of the Lender Funds (in its March 2006 order approving the later Steinberg-Lender settlement), it did not refer to section 506(c). The Lenders' act of transferring the $1.5 million to the Chapter 11 estate in June 2005 does not, without more, make the Lender Funds a section 506(c) surcharge. Nor can Ungaretti legitimately rely on language concerning a settlement that was ultimately superseded by a later settlement that did not contain the same language.

Moreover, shortly after it approved the Szilagyi-Lender settlement, the bankruptcy court took under advisement a motion to vacate that order filed by Lender entities. Although that

motion was withdrawn as moot upon the approval of the Steinberg-Lender settlement, the bankruptcy court took the view that the Lenders' objections were "substantial" and that the court's decision to take the motion under advisement meant that "the enforceability of the Szilagyi/Lender Settlement and the disposition of the Lender Funds were still unresolved" in early 2006. *In re Resource Tech. Corp.*, 356 B.R. at 441. Therefore, even the bankruptcy court's initial approval of the Szilagyi-Lender settlement on Steinberg's motion does not establish that the Lender Funds constitute a section 506(c) surcharge—and, in any event, Ungaretti declines to argue here that this approval had that effect.

For these reasons, the Court does not regard the Lender Funds as a section 506(c) surcharge. Accordingly, Ungaretti's theory that it is entitled to the funds under section 506(c) cannot ground the relief it seeks, and the bankruptcy court's entry of judgment on the pleadings on this count of Ungaretti's complaint was proper. Because the Court determines that the Lender Funds do not constitute a section 506(c) surcharge, it need not reach the question whether Ungaretti would be able to bypass the priority scheme of the Bankruptcy Code and access the funds directly.

### 2.     Constructive trust

In Count 2 of its complaint, Ungaretti sought the imposition of a constructive trust on the Lender Funds in addition to an order enjoining Steinberg from making any disbursements from the funds and requiring the turnover of its reasonable and necessary costs. On appeal, Ungaretti argues that if the Lender Funds are retained by the Chapter 7 estate, they will be a "windfall" that unjustly enriches the estate. Ungaretti further argues that Illinois law does not strictly require wrongdoing as a precondition for the imposition of a constructive trust, as the bankruptcy court reasoned when it rejected this theory.

Steinberg counters that Illinois law requires either actual or constructive fraud or a breach of fiduciary duty to impose a constructive trust, and that Ungaretti cannot show either kind of wrongdoing by a trustee in this case. Steinberg also argues that Ungaretti has a Chapter 11 administrative claim to the assets of the estate, whose priority relative to other claims is dictated by the Bankruptcy Code. Under this circumstance, Steinberg argues, Ungaretti should not be allowed to circumvent the code by means of an equitable remedy.

Ungaretti appears to be correct that Illinois law, which bears on this aspect of the case pursuant to 28 U.S.C. § 959(b), does not always require wrongdoing as a prerequisite to the imposition of a constructive trust. Both the bankruptcy court in its December 4, 2006 order and Steinberg in this appeal rely on *Suttles v. Vogel*, 126 Ill. 2d 186, 533 N.E.2d 901 (1988), for the rule that "a constructive trust will not be imposed unless the complaint makes specific allegations of wrongdoing, such as fraud, breach of fiduciary duty, duress, coercion or mistake." *Id.* at 194. Ungaretti points to *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 735 N.E.2d 560 (2000), a case decided after *Suttles*, to support its argument that wrongdoing is not always a precondition for a constructive trust. *Smithberg* holds that "[a]lthough some form of wrongdoing is generally required for the imposition of a constructive trust . . . a constructive trust may be imposed in the case of mistake, although no wrongdoing is involved." *Id.* at 299, 735 N.E.2d at 565 (*citing Martin v. Heinhold Commodities, Inc.*, 163 Ill.2d 33, 55-56, 643 N.E.2d 734, 745 (1994)). In essence, *Smithberg* suggests that a mistake, in the sense of an asset being conveyed to one whom the grantor did not intend to receive it or whom the grantor mistakenly believed was entitled to it, *see Dubis v. Zarins* (*In re Tiranis*), 128 F.3d 469, 473 (7th Cir. 1997) (applying Wisconsin constructive trust principles), might ground the imposition of a constructive trust.

Even if Ungaretti has offered an accurate statement of Illinois law, however, its theory of a constructive trust cannot ground the relief it seeks. Beyond its bare allegation that "in equity and good conscience, [Steinberg] ought not to be allowed to retain" the Lender Funds, Ungaretti Compl. ¶ 31, Ungaretti's pleadings do not sound in the equitable principles that justify imposition of a constructive trust. Ungaretti does not allege that any specific equitable principle will be violated if the Chapter 7 estate holds the funds (or uses them to pay Chapter 7 administrative costs). Nor could it do so. Steinberg now holds the Lender Funds for the Chapter 7 estate pursuant to the bankruptcy court's March 28, 2006 order. In issuing that order, the bankruptcy court accepted Steinberg's argument that Ungaretti's claim of unjust enrichment contravenes the Bankruptcy Code's scheme for compensation of professionals, which makes Chapter 11 administrative claims such as Ungaretti's subordinate to Chapter 7 claims. 11 U.S.C. § 726(b). Thus, even assuming that a mistake might provide the basis for a constructive trust under Illinois law, Ungaretti does not and cannot point to a mistake by anyone involved—the bankruptcy court, the Lenders, or Steinberg—that has resulted in unjust enrichment of the Chapter 7 estate. The court-approved transfer of the Lender Funds to the Chapter 7 estate was not a mistake in the legal sense. Nor does Ungaretti allege any other form of wrongful conduct in connection with the transfer of the funds to the estate.

Finally, the Court notes that the bankruptcy court has rejected Ungaretti's argument for the imposition of a constructive trust twice, once in connection with Steinberg's motion to have the Lender Funds transferred from Arnstein to the Chapter 7 estate, and again in connection with Ungaretti's motion for a preliminary injunction, which it denied. Ungaretti's argument is similarly unpersuasive to this Court.

For these reasons, the Court concludes that Ungaretti's claim that it is entitled to the imposition of a constructive trust over the Lender Funds cannot ground the relief it seeks. Accordingly, the bankruptcy court's entry of judgment on the pleadings on this count of Ungaretti's complaint was proper.

### 3.     *Quantum meruit*

In Count 3 of its complaint, Ungaretti sought an order enjoining Steinberg from making any disbursements from the funds and requiring the turnover of its reasonable and necessary costs under a theory of *quantum meruit*.  Ungaretti argues that its work for the Chapter 11 trustee conferred a benefit on the RTC bankruptcy estate, the Chapter 7 estate's retention of which without payment is unjust enrichment.

Steinberg argues that Ungaretti must look to the Chapter 11 administrative claim it has asserted and may not circumvent the priority scheme established by the Bankruptcy Code via a principle of equity.  (This is the same objection Steinberg makes in response to Ungaretti's argument for the imposition of a constructive trust.)  Steinberg also asserts that *quantum meruit* cannot give Ungaretti a right to a particular fund, such as the Lender Funds.  The bankruptcy court articulated the same reasoning in denying Ungaretti's motion for a preliminary injunction.

The Court agrees that Ungaretti's argument on this point closely tracks its unpersuasive argument for the imposition of a constructive trust.  The Court regards Ungaretti's invocation of both theories as ill-conceived attempts to evade the reality of its situation as a Chapter 11 administrative claimant in a case that has since been converted to Chapter 7—a step that relegated to a lower tier Ungaretti's claims to the estate's assets.  Moreover, Ungaretti and Szilagyi's own conduct may well have contributed to this development:  the bankruptcy court found at the September 2005 hearing that Ungaretti's receipt of roughly $376,000 from the RTC

estate without the court's authorization showed "a need for further bankruptcy administration," leading to the case's conversion to Chapter 7 and Steinberg's appointment. *In re Resource Tech.*, 356 B.R. at 440. Ungaretti hardly has the "clean hands" required of a party seeking equitable relief. *See, e.g.*, *Gutierrez v. Gonzalez*, 458 F.2d 688, 693 (7th Cir. 2006) (citing the "venerable doctrine that he who comes into equity must come with clean hands").

The Court concludes that Ungaretti's claim of unjust enrichment and entitlement to the Lender Funds under a *quantum meruit* theory cannot ground the relief it seeks. Accordingly, the bankruptcy court's entry of judgment on the pleadings of this count of Ungaretti's complaint was proper.

## C.      Denial of preliminary injunction

Ungaretti also appeals from the bankruptcy court's denial of its motion for a preliminary injunction. The Court has addressed and rejected the three theories under which Ungaretti asserts it is entitled to the Lender Funds in reviewing, *de novo*, the bankruptcy court's grant of Steinberg's motion for judgment on the pleadings. The Court can therefore say that Ungaretti is unable meet the first requirement for a preliminary injunction, namely, a reasonable probability of success on the merits. Accordingly, the bankruptcy court's denial of Ungaretti's motion for a preliminary injunction, which the Court reviews for an abuse of discretion, was proper.

## D.     Settlement agreement

Ungaretti also asks the Court to reverse the bankruptcy court's denial of the Chapter 7

trustee's motion to approve the Steinberg-Ungaretti settlement.  A threshold issue is whether

Ungaretti's appeal from denial of this motion was timely.  The bankruptcy court's order denying

the Chapter 7 trustee's motion was entered on December 4, 2006.  Ungaretti did not appeal that

order until January 26, 2007, the date on which it also appealed the bankruptcy court's January

18, 2007 order that granted Steinberg's motion for judgment on the pleadings, denied Ungaretti's

motion for a preliminary injunction, and granted judgment in Steinberg's favor.  Steinberg now

argues that under Federal Rule of Bankruptcy Procedure 8002(a), which provides that "notice of

appeal shall be filed with the clerk within 10 days of the date of the entry of the judgment, order,

or decree," Ungaretti's appeal is untimely.  Ungaretti counters that its appeal of the December 4,

2006 order is timely because that order was not a final, appealable order.

"In ordinary federal litigation, a final judgment is an order resolving all disputes of all

parties . . . .  However, because bankruptcy proceedings are often comprised of many discrete

disputes, most of which come to a logical conclusion before the entire estate is settled, courts

have generally interpreted [28 U.S.C.] § 158 finality more liberally than [28 U.S.C.] § 1291

finality."  *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1299 (7th Cir. 1997) (*citing* John P.

Hennigan, Jr.*, Toward Regularizing Appealability in Bankruptcy*, 12 Bank. Dev. J. 583 (1996)).

That is, in the Seventh Circuit, courts "apply[] finality in the bankruptcy context with a relaxed

eye."  *Id.* (*citing In re Gould*, 977 F.2d 1038, 1040-41 (7th Cir. 1992) and *In re Powelson*, 878

F.2d 976, 980 (7th Cir. 1989)).  The first question the Court must ask, then, is whether this

approach to finality encompasses the bankruptcy court's refusal to approve the Steinberg-

Ungaretti settlement, such that Ungaretti was required to appeal it within ten days of December 4, 2006.

Ungaretti relies on *Providers Benefit Life Ins. Co. v. Tidewater Group, Inc.* (*In re Tidewater Group, Inc.*), 734 F.2d 794 (11th Cir. 1984), for the proposition that unlike an order that approves a settlement, "[a]n order disapproving a compromise . . . is not final. It determines no rights and settles no issues. It merely leaves the question open for future adjudication." *Id.* at 796 (*quoting Tonkoff v. Synoground* (*In re Merle's Inc.*), 481 F.2d 1016, 1018 (9th Cir. 1973)). This rule—that an order leaving some nontrivial quantum of issues open for later adjudication is not final—is widely accepted in the bankruptcy context. *See Brouwer v. Ancel & Dunlap* (*In re Firstmark Corp.*), 46 F.3d 653, 658 (7th Cir. 1995) (describing the "criteria" the Seventh Circuit uses to "determine finality in the more flexible bankruptcy context" as whether the decision resolves the parties' substantive rights and whether it marks the conclusion of what, but for the bankruptcy case, would be equivalent to a stand-alone suit); *In re Forty-Eight*, 115 F.3d at 1299 (bankruptcy court's order denying a stay was not final because it did not "finally determine [certain creditors'] position vis a vis [debtor's] settlement trust."); *Dubin v. SEC* (*In re Johns-Manville Corp.*), 824 F.2d 176, 179 (2d Cir. 1987) (*quoting In re Saco Local Dev. Corp.*, 711 F.2d 441, 444-46 (1st Cir.1983)) (an order of the bankruptcy court "may be immediately appealed if it disposes of discrete issues within the larger case"); *Lockwood v. Snookies, Inc.* (*In re F.D.R. Hickory House*), 60 F.3d 724 (11th Cir. 1995); *Simons v. FDIC* (*In re Simons*), 908 F.2d 643, 644-45 (10th Cir. 1990) (bankruptcy court's rejection of proposed Chapter 13 plan was not final because it did not end the litigation on the merits and "contemplate[d] significant further proceedings in the bankruptcy court").

Did the bankruptcy court's order leave some issues for later litigation, such that it was not final? One could argue—although Steinberg does not—that the order denying approval of the settlement and the bankruptcy court's order the next day granting the parties leave to file motions for summary judgment left little doubt as to the likely outcome of the adversary proceeding. After all, the bankruptcy court's finding that the Steinberg-Ungaretti settlement was outside the reasonable range of expected litigation outcomes rested on its view that Ungaretti "is likely to recover nothing from the estate." *In re Resource Tech. Corp.*, 356 B.R. at 449.

The Court, however, declines to give decisive effect to this logic for the purpose of determining whether the December 4 order was a final one from which Ungaretti could no longer appeal by January 18. A mere suggestion to the parties of the likely outcome of a dispositive motion does not amount to an immediately appealable, final decision. *Cf. Expeditors Int'l of Wash., Inc. v. Citicorp N. Am., Inc.* (*In re Colortran*), 218 B.R. 507, 510 (B.A.P. 9th Cir. 1997) (order was final where the bankruptcy court went beyond merely refusing to approve a settlement by invalidating a creditor's lien by ordering turnover of the property on which the lien was asserted). For these reasons, the Court determines that the order was not a final, immediately appealable order and therefore will consider the merits. *See In re Salem*, 465 F.3d 767, 774-75 (7th Cir. 2006) ("As a general rule, the failure to file an interlocutory appeal does not waive the ability to have an issue reviewed upon final appeal . . . To the contrary, one of the purposes of the final judgment rule is to permit consolidated review of all interlocutory decisions that still matter.").

As noted above, the Court reviews the bankruptcy court's decision to approve or deny approval to a proposed settlement for abuse of discretion. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d at 426. "If the decision demonstrates a command of the case, we will not engage

in second-guessing." *Id.* The bankruptcy court's December 4, 2006 order indeed demonstrates a thorough command of the case and the trajectory of the adversary proceeding. The bankruptcy court also applied the correct legal standard—the best interests of the debtor's estate, measured by a comparison of the proposed settlement's terms with the likely costs of litigation and an assessment of whether it is within the "reasonable range" of litigation outcomes, *id.*—in declining to approve the Steinberg-Ungaretti settlement. The Court cannot conclude that the bankruptcy court's denial of approval for the Steinberg-Ungaretti settlement amounted to an abuse of its discretion.

### III. Conclusion

For the foregoing reasons, the Clerk is directed to enter judgment affirming the decision of the bankruptcy court.

MATTHEW F. KENNELLY
United States District Judge

Date:   March 5, 2008